# A. J. RIDDLE V. C. C. LANIER.

No. 7544.  Decided January 1, 1941.
Rehearing overruled February 26, 1941.
(145 S. W., 2d Series, 1094.)

*John Atchison* and *Cecil Murphy*, both of Gainesville, for plaintiff in error, A. J. Riddle.

The landowners and royalty owners should be made parties to the suit. East Texas Fire Ins. Co. v. Coffee, 61 Texas 287;

Arrington v. Southern Pine Lbr. Co., 16 S. W. (2d) 166; Smith v. Peeler, 29 S. W. (2d) 975.

The measure of damages for the failure to drill a test well in an undeveloped territory is the value of the royalties contemplated and which would probably have been secured had the test been made. Guardian Trust Co. v. Brothers, 59 S. W. (2d) 343; Freeport Sulphur Co. v. American Sulphur Co., 117 Texas 439, 6 S. W. (2d) 1039.

*W. S. Moore,* of Gainesville, for defendant in error, C. C. Lanier.

Where defendant breaches his contract to drill a test well for oil and gas in an undeveloped territory, the measure of damages is the cost of the well and such special damages, properly pleaded and proven, as he may have suffered from the breach of said contract. Covington Oil Co. v. Jones, 244 S. W. 287; Texas Pac. Coal & Oil Co. v. Stuard, 7 S. W. (2d) 878; Henry Oil Co. v. Head, 163 S. W. 311; 2 Sutherland Damages, 1365.

MR. JUDGE GERMAN delivered the opinion of the Commission of Appeals, Section A.

C. C. Lanier as plaintiff sued A. J. Riddle as defendant in the District Court of Cooke County for damages growing out of breach of a contract to drill a test oil well. The parties will be designated as in the trial court.

It appears that prior to May 31, 1935, plaintiff assembled a block of oil leases on some 3,000 acres of land in Cooke County, the block being made up of numerous leases by various land owners. None of these leases are in the record, and we are left entirely without information as to the rights and obligations of plaintiff under same. However, there is sufficient parol evidence to indicate that they were the usual commercial leases, providing for the usual royalties, and requiring the beginning of operations within a specified time, or payment of annual rentals in lieu of operations.

It further appears that on May 31, 1935, plaintiff entered into some kind of a general contract with the various land owners, wherein it was contracted that the drilling of one well upon what was known as the Thetford 60 acres was to be taken as the fulfillment of the obligation to begin operations under the various leases. Unfortunately we do not have full information as to the terms of this contract. From the parol testimony we are led to the conclusion that this contract, together with

the original leases by the various land owners, was placed in a bank to be delivered, either at the time of the commencement of the well on the Thetford tract, or when the drilling of that well was completed.

Plaintiff by his testimony shows that he was unable to drill the test well on the Thetford tract, and further shows that his principal business was to assemble a block of leases, and then assign a portion of the leases to some one else as consideration for the drilling of a test well. On November 13, 1935, plaintiff entered into a contract with defendant wherein defendant assumed the obligation of drilling the test well, and wherein plaintiff agreed to assign to defendant as a consideration therefor leases upon some 1030 acres of said lands. Said contract, among other things, recites the following: "Whereas second party (plaintiff) did enter into a written contract on the 31st day of May, 1935, with J. D. Leeper and other land owners in Cooke County, Texas, wherein certain rights, interests, obligations and performances were assumed by C. C. Lanier, the said contract being hereby incorporated by direct reference and the same made a part hereof for every purpose." The contract referred to was not put in evidence.

The contract further recited that the first party (defendant) desired to perform and assume all of the obligations in the said contract executed by and between C. C. Lanier and J. D. Leeper and other land owners, and second party (plaintiff) desired to assign the rights, title and interest in and to the said contract above referred to and incorporated in the contract. The various leases to be assigned were set out in the contract. It was further provided that all the assignments to be executed by plaintiff were to be executed to V. V. Waite, for the benefit of defendant, and that same was to be the full consideration to be paid defendant for the execution and performance of the contract. The principal obligation assumed by defendant is as follows:

"First party agrees to drill a test well on the 60 acre tract hereinafter described and to continue drilling of said well with due diligence until the same shall have reached the depth of 3500 feet, unless oil or gas in commercial quanities is found at a lesser depth, or unless the Ellenburger Limestone or Granite, or some other impenetrable substance is encountered, making further drilling operations impracticable."

Shortly after the making of said contract of November 13, 1935, defendant began drilling a well on the Thetford tract. He proceeded with the drilling until a depth of 1830 feet was reached, without encountering Ellenburger Limestone or

Granite, or some other impenetrable substance. The work was abandoned at that debth, the machinery was removed, and the hole plugged. Apparently the only reason why defendant refused to drill the well deeper was the belief on his part that no oil would be discovered if the contract was fully performed.

Plaintiff instituted this suit, claiming that he had been damaged to the extent of the cost of the drilling the test well, and further had been damaged in depreciation in the value of leases on the remaining 1370 acres of land. He has waived all damages as to the Thetford 60 acres, although he had retained a one-half interest in the leases covering that tract.

In the trial court the jury found that the cost of completing the well which had been abandoned on the Thetford tract would have been $22,000. It was further found that the cost of drilling a well from the surface to the contracted depth would have been $15,000. The jury found that the reasonable cash market value of plaintiff's leases on the remaining 1370 acres before the well was abandoned was $6.00 per acre, or $8,220, while the reasonable cash market value of same after the well was abandoned was $1.00 per acre, or $1370. There was a further finding that if the well had been completed to the depth of 3500 feet, or to the Ellenburger Lime or Granite or some other impenetrable substance, plaintiff's remaining leases would have been worthless. It was also found that the Ellenburger Lime would not have been encountered if the well had been drilled to a depth of 3500 feet.

The trial court denied plaintiff's claim for damages based on cost of drilling the well, but entered judgment in his favor for $4558.75. This amount represented decrease in value of leases before and after abandonment of the well, less the value of certain leases which the court found had been sold prior to the abandonment of the well. This judgment was affirmed by the Court of Civil Appeals. 121 S. W. (2d) 655.

Both sides appealed, and both have come to this Court by writ of error.

Defendant contends that under the facts of this record, plaintiff was not entitled to recover the decrease in value of his leases. His writ of error was granted, and plaintiff's writ was granted because of the granting of defendant's. Plaintiff urgently contends that he was entitled to recover the cost of drilling the test well, and in addition was entitled to special damages, said special damages being the difference between the value of his remaining leases before the abandonment of the

well and their value after abandonment of the well, with no deductions for sales of leases made before the abandonment.

We will first dispose of plaintiff's proposition that he was entitled to recover the cost of drilling the test well, towit, $15,-000. What is known as the "cost" theory of damages for failure to drill an oil well of a prospective or exploratory character has been vigorously debated in many cases. This is well illustrated by the recent case of Fite v. Miller, 192 La. 229, 187 So. 650, and the annotations thereunder in 122 A. L. R. 458. Practically every case touching the various phases of the question is there mentioned. In a few of the earlier cases the cost theory was adopted in certain classes of cases. This was particularly true in Oklahoma. It is fitting, however, to say that the federal courts in a case arising in Oklahoma have recently refused to follow that rule. Hoffer Oil Cor. v. Carpenter, 34 Fed. (2d) 589 (Certiorari denied 280 U. S. 608, 50 Sup. Ct. 158, 74 Law ed. 651.)

Without an extended discussion of the subject, or of cases, we may say that it is now settled by the great preponderance of decisions, and especially by our own, that the cost of drilling a test or exploratory well for oil has been entirely repudiated, except perhaps in cases where the cost has been paid in advance for the drilling of a well, which, when and if completed, will belong entirely to the owner of the land or leases, and in which the driller will have no interest. Guardian Trust Co. v. Brothers, 59 S. W. (2d) 343 (writ ref.) ; Fain-McGaha Oil Cor. v. Owens, 132 Texas 109, 121 S. W. (2d) 982; Golston v. Bartlett, 112 S. W. (2d) 1077; Atl. Oil Producing Co. v. Masterson, 30 Fed. (2d) 481, and cases supra.

In the case of Guardian Trust Company v. Brothers, supra, it was clearly recognized that the general rule of measuring damages in case of breach of contract applied to a contract for drilling an oil well. In discussing the question of damages in that case the court stated the general rule in this language:

"In determining this question it is necessary to keep in mind the universally recognized rule that, for breach of contract the injured party is entitled to have the value to him of its performance, and, in awarding compensatory damages, he should be put as near as possible in the same position as that in which he would have been put by performance. The rule is stated in 17 C. J. sec. 168, pages 848, 849, in this language: 'But a plaintiff is not to be put in a better position by a recov-

ery of damages for the breach of a contract than he would have been in if there had been performance.' "

There is absolutely no reason why this rule of "value of performance" should not be applied in the present case. Nor is there, to our minds, any logical reason why it could be said in this particular instance that the cost of drilling a well was the value of performance. No more should the cost rule measure the value of performance in this case, where speculative and anticipated profits on sales of leases were the primary benefit contracted for, than in other cases where prospective and anticipated royalties are the primary benefits contracted for. Plaintiff seeks to say, however, that the cost rule should govern here, because, he contends, the cost of drilling the well was paid in advance by assignment of leases. He overlooks the fact, however, which is emphasized in some of the decisions, that he was not paying defendant for the drilling of a well which was to become the property of plaintiff when completed. Plaintiff was not contracting for a well as such. What he was contracting for primarily was benefits to his remaining leases. He has waived damages as to the Thetford 60 acre tract and claims damages solely by reason of the remaining leases covering 1370 acres. We think his pleadings clearly define the measure of his damages and refute his logic concerning cost of drilling the test well. The benefits which he alleges he would have received (that is value of performance) if the well had been drilled have been explicitly defined.

Paragraph 11 of his petition is as follows:

"The plaintiff further alleges that by reason of the wrongful abandonment of the drilling of said well, and the failure and refusal of the defendant to comply with the terms of the contract for the drilling of a well as provided, the plaintiff suffered other and special damages in addition to the reasonable cost of the drilling of said well to completion and in addition to the damages suffered as to his rights in the 60 acre tract of the Thetford tract on which said well was to be drilled, in that the plaintiff had retained oil and gas leases on some 1370 acres of land adjoining said Thetford tract and in the same general vicinity, and that owing to the making of said contract to drill said well and the prospect of the same being drilled to its contract depth and owing to the fact that oil and gas either or both would have probably been found in paying quantities, the value of the said oil and gas leases so retained by the plaintiff, had been enhanced in value; that if said well had been completed to its contract dept, and while

same was being so completed, plaintiff could have and would have sold his said leases at prices ranging from $10.00 to $25.00 per acre; that at the time said well was wrongfully abandoned, and had the drilling of the same been continued, the reasonable cash market value of said leases was $10.00 to $25.00 per acre, depending on location and distance from said well; and he alleges that said market value was completely destroyed by the wrongful abandonment of said well by the defendant and his failure and refusal to drill said well, or another well to completion as provided in said contract, and that on this account and by way of special damages, the plaintiff suffered damages in the sum of $9,000.00, in addition to the damages suffered in the reasonable cost of completing the drilling of a well under the provisions of said contract, and for all of which the defendant has become and is liable."

The fact that plaintiff designated the damages thus claimed as special damages does not change the fact that he thereby definitely set forth what the value of performance would have been to him.

From this part of the pleading it appears that plaintiff based his claim for damages as regards his leases upon the theory that if the well had been completed, "while same was being completed," he could and would have sold his leases at prices ranging from $10.00 to $25.00 per acre. There is good authority holding that this character of alleged profits is too remote and speculative to form the basis of special damages. Artwein v. Link, 108 Kan. 393, 195 Pac. 877. However, we do not need to decide this question, because there is no basis in the findings of fact to permit a recovery in this respect. It will be noted that the judgment awarded plaintiff was based on two findings by the jury. One as to the effect that plaintiff's remaining leases were worth $8220 before the well was abandoned, and the other that they were worth $1370 after it was abandoned. It is undisputed, however, that up to the time of abandonment plaintiff would not have sold any of these leases, even if he could. In one instance plaintiff testified as follows:

"Q. You didn't sell any during the time the well was drilled?

"A. You didn't have very much time to sell it. I didn't want to sell."

In another instance he testified in this regard as follows:

"Q. Mr. Murphy asked you if it wasn't true that you didn't

sell a foot of the acreage retained by you under your contract with Riddle as a part of the 2300 and odd acre block, and you said you didn't sell any of it. I wish you would tell the jury why you didn't sell any of that acreage.

"A. My contract had been made with Mr. Riddle to drill the well and I thought the well would be drilled. It takes time to sell acreage in the first place, and in the second place I didn't want to drill my acreage until we got to a greater depth. There was a possibility of getting into deeper sands and I didn't want to sell my acreage at that depth."

■ It is thus clearly shown that plaintiff was taking his "gamble" on complete performance of the contract. The record is wholly without a finding of fact as to what plaintiff's profits, if any, would have been in the matter of sale of leases if the well had been drilled to the depth of 3500 feet. It is obvious that if he made any profits at all he would have been required to sell some or all leases before the well reached the depth of 3500 feet. Under finding of the jury immediately it reached that depth the leases became worthless. The only finding concerns the difference in value of the leases before the abandonment of a well and after the abandonment of the well. This is far from a finding as to the profits plaintiff would have made on sales, if any, during the time the well was being completed. The burden of proof was upon plaintiff to show what the value of full performance would have been to him. He obtained no finding in his favor in this regard. On the contrary, there was a finding by the jury to the effect that if the well had been drilled to the depth of 3500 feet plaintiff's leases would have been worthless. In light of the evidence we interpret this finding to mean that no oil would have been discovered if the well had been drilled to completion as contracted. In our opinion, there was ample evidence to sustain such a finding. However, plaintiff made no assignment in the Court of Civil Appeals attacking this finding as being without support in the evidence.

■ Defendant complains of lack of necessary parties. We do not think the landowners and royalty holders were necessary parties. The leases have long since been forfeited, and the decision of this case can in no manner affect them. However, we are of the opinion that in event of another trial the contract of May 31, 1935, should be produced, or its terms proven more fully than was done in this trial.

The judgments of the Court of Civil Appeals and of the district court are reversed, and the cause is remanded.

Opinion adopted by the Supreme Court January 1, 1941.

Rehearing overruled February 26, 1941.