Earl FAIN, Jr., Appellant,

v.

TEXAS–HANOVER OIL COMPANY, Appellee.

No. 10911.

Court of Civil Appeals of Texas.

Austin.

Feb. 14, 1962.

Rehearing Denied March 7, 1962.

Kilgore & Kilgore, Kiel Boone, Dallas, for appellant.

Neill, Blanks, Lewis & Logan, San Angelo, for appellee.

ARCHER, Chief Justice.

This is an appeal from a judgment of the District Court based on a jury verdict in answer to the first four Special Issues in favor of appellee and against appellant for $8,105.18, with interest at the rate of six percent from the date of judgment and for foreclosure of a mechanic's lien as against Earl Fain, Jr. and Rupert C. Thompson, Jr., upon an undivided 5/12ths part of the interest of the lessee in an oil and gas lease upon the Juan Hernandez Survey No. 347 in Runnels County and certain casing and tubing and that the proceeds of a cashier's check for $7,592.68 (fully identified) be applied to the payment of the judgment.

The appeal is founded on seven points and are that the Court erred in submitting as a fact issue the question of consent to the relocation of the well where such issue was only as to an evidentiary element; that there was neither sufficient evidence nor any evidence in support of the jury's answer; in permitting plaintiff's President to testify as to his intention in the execution of an agreement amounting to an accord and satisfaction of the controversy; in submitting definitions and issues amounting to a comment on the evidence; in failing to require the plaintiff's counsel to fully open the case in argument; in allowing plaintiff interest, and finally in denying defendant a recovery on his cross action.

Texas-Hanover Oil Company, appellee herein, filed the suit, out of which this appeal grows, against Earl Fain, Jr., appellant herein, for $7,592.68 with six percent interest and for foreclosure of a mechanic's lien on 5/12ths interest in an oil, gas and mineral lease, casing and tubing, and alternatively for the title and possession of the 5/12ths interest in the lease on Survey No. 347, together with the application of the proceeds of a cashier's check.

On June 2, 1959 Earl Fain, Jr. and others not involved in this appeal made an agreement with Texas-Hanover Oil Company to drill an oil or gas well on certain terms and conditions, none of which except item

No. 1 is in question. Item No. 1 reads as follows:

"The well is to be located 3300 feet from the Northeast line and 660 feet from the Northwest line of said Juan Hernandez Survey No. 347, above described."

The well was actually drilled and completed at another location some 2530 feet approximately from the Northeast line and it is the relocation of the well which is at issue in this appeal.

The appellee asserts that the original location was in a low place in a field and that the owner of the growing crops wanted the well at another place and that Mr. Harris talked to Mr. Fain and Mr. Cannon, the geologist on the well, by long distance telephone in New Mexico and his testimony in part is as follows:

"A I said, 'Earl, I talked to Mr. Currie, and he has asked us to move the location of the well to a higher ground; that it will be a bog if it rains, and he would lose a lot of good valuable feed for his cattle, and they were now grazing in there, and he would appreciate it if we would move it.' I told him I would see what I could get done. And Earl Fain said, 'Well, I don't remember what's in the contract.' And, I said, 'Well Earl, I don't remember what's in the contract either; I don't have it here at the house, but I do think this, that if we can accommodate the man we ought to do it.' He said, 'Well, Bob—you will have to talk with Bob Cannon about that; he is the geologist on that job, and if it don't hurt the play any by moving it,' he said, 'that might be all right.' So, Bob Cannon came to the phone and he said it wouldn't make a bit of difference to move it any direction geologically it wouldn't. So, I said, 'Bob, I am going to move it if I can get Carson's and Black's permission.' The next day I called Carson

and Black in Midland, and they both agreed, and I went out and moved it.

"Q Did you drill the well, then, at the changed location?

"A Yes.

\* \* \* \* \* \*

"Q Roger, in some of Mr. Fain's papers filed in this case, called pleadings, he has said that in the conversation you had with him over the telephone when you were in San Angelo and he was in New Mexico, that he told you that if you changed that location it would have to be at your own risk, and you agreed to that; was anything said about that?

"A Nothing; no.

"Q Did he ever say anything of that effect to you about it until after the deal, well had been completed and capped?

"A Not until we got down to paying the bills.

"Q And are you positive which of those gentlemen you talked to first, and which you talked to last?

"A I talked to Fain first.

"Q And Cannon next?

"A That's right.

"Q Did you talk to Mr. Fain after you talked to Bob Cannon?

"A I did not.

"Q And what was it Cannon said to you?

"A Cannon said it would not make a bit of difference if we moved the location, one location in any direction; it would not make a bit of difference geologically, and in our chances for finding oil.

"Q What was it you had said to Fain about changing the location?

"A I told him my conversation with Mr. Currie and that I strongly recommended we change it, if it would help him, help Mr. Currie.

"Q What did Mr. Fain say?

"A And Mr. Fain says, that will be a matter, or words to that effect, the changing of the location would have to be left up to Bob Cannon; it is his deal, and he is the geologist; and I said, let me talk to Cannon, and I talked to Cannon and Cannon told me it wouldn't effect it one way or the other."

R. L. Cannon, the geologist on the well testified in part:

"Q Let's get back to the telephone conversation the week of July 18, 1959; recall, if you can, and as nearly possible as you can, Mr. Cannon, what transpired in connection with that conversation.

"A Well, we were at dinner, Mr. Fain and I, and there was a telephone call for us, and Mr. Fain went to the phone and talked and came back and told me it was Mr. Harris.

"Q About how long was that that Mr. Fain was gone in answering the telephone call, long distance?

"A Well, it wasn't a long conversation. I don't know how long. I couldn't tell you how long it was, but I wouldn't consider it a long conversation.

"Q Mr. Fain came back and gave you a message? I can't go into what he told you.

"A He told me—

"Q I can't go into that.

"A He told me Roger Harris was calling, and would like to talk to me.

\* \* \* \* \* \*

"Q Mr. Cannon, I hand you what has been marked Plaintiff's Exhibit No.

23 that purports to be a copy of a letter dated October 14, 1959, addressed to Earl Fain, Jr.; did you write that letter, Mr. Cannon?

"A Yes, sir. I believe this is the letter I wrote on that.

"Q All right, sir; just to keep it in context it is a brief letter, I will read it. 'Dear Mr. Fain: It is my understanding that the responsibility for the overseeing of the payment of the bills on Texas Hanover No. 1, Lyle Currie, has been shifted to Mr. John Tester, attorney at law. In that case my responsibility is only that of a professional geologist in charge of the well. The well was drilled in satisfactory fashion to 4712 feet, and in my opinion all shows of oil were tested. The location was changed because of the situation on the land, and I approved its change from a geological standpoint. Very truly yours, R. L. Cannon.' That was a statement of what your position was?

"A Yes, sir.

\* \* \* \* \* \*

"Q O.K.; Mr. Cannon, the well was drilled in a completely satisfactory manner to you, wasn't it, sir?

"A Yes, sir, it was all right.

"Q And the moving of the location did not make any difference to you at all did it, so far as your thinking was concerned, with respect to its prospects?

"A That's correct.

"Q You just as soon had it drilled where it was drilled as down in the field, hadn't you?

"A Yes, sir.

"Q Now, then, did you have an interest in that lease?

"A Yes, sir.

"Q A 32nd override?

"A Yes, sir. My brother and I had a 32nd override, together.

\* \* \* \* \* \*

"Q You yourself never heard, never heard Mr. Fain say a word about Roger having to do that on his own responsibility, did you, sir, if he changed the location?

"A What was that?

"Q That is strange language to you isn't it?

"A That question didn't come up at that time, if that is what you mean.

"Q About Roger assuming the responsibility of it, that didn't come up, did it, in that conversation?

"A The only thing I recall there was just hearing Fain say, 'I will not agree to any change of the location which would affect my contract with you.'

\* \* \* \* \* \*

"Q There wasn't anything said, as far as you heard in that conversation between Fain and Harris, about any of the people that Fain had as silent partners, was there?

"A I don't recall anything.

"Q You just didn't hear a thing about those other people, did you, in that conversation between Fain and Harris?

"A No, I don't recall any in that conversation.

\* \* \* \* \* \*

"Q When he got out there he noticed the change in the location, didn't he?

"A Yes.

"Q Now, then, with Mr. Harris present and Mr. Fain present, at any time you didn't hear Mr. Fain say, 'Mr. Harris, I am repudiating this location,' did you?

"A No.

"Q Now, then, as a matter of fact when it looked like you had a well there Mr. Fain was quite happy, wasn't he?

"A I would say all of us were happy when we thought we had oil."

Mr. Fain testified as to the contract location of the well to be 3300 feet from the northeast line and 660 feet from the northwest line of Survey 347 and as to the respective interests in the property. He further testified as to the relocation of the well and particularly as to a telephone conversation with Mr. Harris when the witness and Bob Cannon were in New Mexico and that he heard Mr. Cannon say that the move of the well location was satisfactory with him geologically; that he, Fain, told Harris that he had a contract with other people and would not do anything to violate or change the contract and that if he, Harris, wanted to move it to get it up on a hill to save money, it will have to be at Harris' responsibility because he was not going to agree to it.

Mr. Fain was present when tests were being made and did not register any objections to the relocation of the well.

Harris testified:

"Q I will tell you, we will get around to that directly. Now, then, you stated that you phoned Black and Carson?

"A Yes.

"Q And was that agreeable with them?

"A Yes.

"Q After that, then, you commenced a well and you drilled it?

"A That's right.

"Q Down to that 4710 feet; did you have any shows?

"A Yes, we had one, two, three shows, as I remember, that were worth testing.

"Q And did you drill stem test one of those?

"A Yes.

"Q At about what depth was it?

"A As I remember it was around 4200, between 4000 and 4200.

"Q Was Fain out there when that drill stem test was conducted?

"A Yes.

"Q What did that indicate; what did it show?

"A Well, for forty minutes after— they called me in Midland. I assumed that Fain was in Dallas, or he might have been here, I don't know; they told me they have a flowing well on the drill stem test, and I think they have shut it in, awaiting our arrival. Well, I got here as soon as I could, and we went out to the well, all of us. I think it was after dark; at the close of that day, and we opened it up again, and the well flowed oil and gas; no water, I would judge for forty minutes, and it made what I would guess to be between five and ten barrels an hour.

"Q Now, then, was Cannon there at that time?

"A Yes.

"Q And Mr. Fain?

"A Yes."

R. L. Cannon testified:

"A I was out there during the drilling. I was available from the time it was under casing pipe on down.

"Q You saw Mr. Fain out there from time to time, didn't you?

"A Yes, sir.

"Q Sir.

"A Yes, sir.

"Q About how many occasions while the drilling was in progess?

"A Well, he was there when we were drilling the Goen, which was about—that was about 4000 feet, some where along there. Right at the moment that's the first time I recall.

"Q Was he there at 1400 feet, approximately?

"A Was he there at that time?

"Q Yes.

"A I don't recall, Mr. Lewis; I sure don't.

"Q You testified that he was in your deposition, didn't you?

"A Well, I don't know. If I did, that was my memory at the time.

"Q And that would be closer then than now, wouldn't it

"A Yes, sir; about a year back, almost.

 *     *     *     *     *     *

"Q I asked this question, right now, did he complain while that well was being tested, drillstem tested, while it was apparently going to be a good producer; he wasn't complaining about that location then, was he?

"A He did not complain about it at that moment in my presence.

"Q All right; you never did hear him complain to Mr. Harris about it, did you?

"A No, I didn't hear him talk to Mr. Harris except at Vermejo Park.

"Q And you saw both of them at the well on that occasion, didn't you?

"A Yes, sir.

"Q Drillstem test?

"A Yes, sir.

"Q Did you see them together at the well on any other occasions?

"A Yes, sir. I think they were there on several occasions together."

The Court submitted Special Issue No. 1 reading:

"Do you find from a preponderance of the evidence that in the telephone conversation between Roger Harris and Earl Fain, Jr., on or about July 14, 1959, Fain told Harris in substance that he (Fain) would consent to the change of the location of the well if R. L. Cannon would approve it?"

Appellant objected to the submission of this issue and suggested that an issue, if submitted, should read:

"Do you find from a preponderance of the evidence that the Defendant consented to the drilling of the well where it was located?"

The essential issue is consent for the change of the well from one location to another, rather than the consent to drilling of a well at some designated relocation and other than that set out in the agreement.

■ We believe the issue as worded fairly submitted the issue of an "agreement" to move the well at all and was an ultimate issue. From the geologist Cannon's view a change in the location from 3300 to 2500 feet from the northeast line was not important. The issue fairly submitted the theory of both parties, which essentially was: Did Fain agree to the relocation of the well? The answer of the jury was reasonably supported by the evidence and the conduct of the parties. General Finance & Guaranty Co. v. Smith, Tex.Civ.App., 309 S.W.2d 531, error ref., N.R.E.

Appellant's third point is directed to the error of the Court in permitting Roger Harris, President of appellee, to testify, over objection, as to his intention in signing a

letter in the nature of a settlement of the controversy. The letter from Mr. Fain is dated October 14, 1959 and addressed to John Tester at San Angelo, Texas and outlines a manner of settlement. Attached to the letter are certain checks to be delivered in accordance with the instructions therein set out. The contents of the letter is as follows:

"Dear Mr. Tester:

"I hand you herewith Cashier's Checks payable to you as follows:

"1) Check #X496572 in the sum of $780.48

"2) Check #X496573 in the sum of $6812.20

"3) Check #X496574 in the sum of $7592.68

"Upon receipt of:

"a) An assignment from Texas-Hanover Oil Co. to Earl Fain, Jr. for immediate delivery to me of ⅝ths of the working interest in the lease referred to in the contract dated June 2, 1959 between B. F. Black, J. P. Carson and Texas-Hanover and the leases referred to in the contract dated May 20, 1959 between Texas-Hanover and the Mound Co.;

"b) A Cashier's Check in the sum of $6281.07 payable to Earl Fain, Jr. for immediate delivery to me;

you are to do the following:

"1) Mail Check #1 in the sum of $780.48 to Schlumberger Well Surveying Co., Houston, Texas in payment of their invoice #65936 I charged on their books to Earl Fain, Jr., but actually the obligation of Texas-Hanover as part of the surveying cost of the Lyle Currie #1, Runnels Co., Texas;

"2) Deliver Check #2 to Texas-Hanover;

"3) Deliver assignments referred to above to me;

"4) Deliver Cashier's Check in the sum of $6281.07 in payment of Texas-Hanover's portion of the completion costs of the Lyle Currie #1 to me;

"5) Hold Check #3 in the sum of $7592.68 referred to above under the following terms:

"a) If on or before November 15, 1959, I advise you that the objection created by Texas-Hanover's breach of their drilling contract has been waived by assignee, you, upon satisfactory evidence that all of Texas-Hanover's bills in connection with the drilling of the Lyle Currie #1 have been paid, you are to turn the check over to Texas-Hanover in payment of their bill for drilling said well.

"b) If on or before November 15, 1959, I advise you that such objection has not been waived by assignee, you are to return the check endorsed to my order.

"This agreement is subject to Texas-Hanover's acceptance by October 22, 1959. 22, 1959.

"Very truly yours,

Earl Fain, Jr.
Earl Fain, Jr.

"This agreement accepted by Texas-Hanover Oil Company October 22, 1959:

Roger Harris, President

Jewel Richardson, Secretary"

The testimony complained of is as follows:

"Q. Now, then, is there anything in that letter, does it say a thing in the world about your doing that in final settlement of that claim against him?

"A. None whatever.

"MR. BOONE: We object to that; it speaks for itself.

"COURT: I sustain the objection.

"Q. Now, then, in delivering your check, cashier's check for approximately $6200 and taking one out for approximately $6800, and delivering your assignments there to Fain and Black and Carson, did you understand or intend that you should be accepting that difference of around $600 in full and final settlement of everything Fain owed you?

"A. Certainly did not.

"MR. BOONE; We object to that. His subjective intent is not material to the construction of this letter. The letter is the best evidence of (what) went in the letter. The parties agreed on it; both of them signed it; both of them accepted it. What Mr. Harris' understanding was, what his subjective or secret intent was in performing in accordance with the letter agreement isn't a proper subject, it is not proper evidence before this court.

"MR. LEWIS: If the Court please, he has been talking about accord and satisfaction, you don't have accord and satisfaction unless the party that's charged with having delivered an accord and satisfaction understood and intended it should be such.

"MR. BOONE: The letter, again, speaks for itself, Your Honor. I would just like a Court ruling.

"THE COURT: I overrule the objection."

■ We do not believe that the admission of the testimony was objectionable. We do believe that the letter and the procedures outlined therein did not comprehend a final settlement in the event the November 15th date should pass without Fain having advised Mr. Tester that Thompson had waived objection to the changed location and was to this extent ambiguous.

The letter contains several conditions and in nowise provided that Texas-Hanover would renounce its claim to the sum of $7592.86.

On November 10, 1959 Mr. Fain wrote the attorney for Texas-Hanover and stated that one of his partners had refused to waive the change of location and that such partner's part of the obligation to Texas-Hanover would amount to $4166.66 and stated:

> "Now, as a matter of compromise—which, if not accepted, does not prejudice my right of damages or right of demanding specific performance—I am willing to pay to Texas-Hanover the total sum due them (upon satisfaction that all bills have been paid) less the one-eighth portion mentioned before, or $4166.66. This would mean that Mr. Tester would turn over to Texas-Hanover the sum of $3426.02 and return to me the sum of $4166.66. If this is not acceptable to Texas-Hanover, I will have to instruct Mr. Tester to return to me the check for $7592.68 which he is holding and stand on the provisions of the contract dated June 2, 1959."

■ One party to an agreement may testify as to his intent when such becomes a material point of inquiry, such evidence is not conclusive. 17 Tex.Jur. p. 406; Reed v. Reed, Tex.Civ.App., 303 S.W.2d 460, reversed on other issues Reed v. Reed, 158 Tex. 298, 311 S.W.2d 628; Tex.Jur. Vol. 10–A, p. 406; Wigmore, Vol. 1, pp. 715–721.

Appellant's fourth point is directed to the submission of modified versions of defendant's requested definitions and issues.

Defendant requested the following definition:

> "An 'accord and settlement' as used in this charge is an agreement where-

**958**

by one of the parties undertakes to give or perform and the other to accept, in satisfaction of a claim, something other than or different from what he is, or considers himself, entitled to."

The instruction as given was the same as that requested except the words "mutually intended" were inserted in front of "agreement", and "a" was substituted for "an".

■ The Court in its main charge sufficiently covered the requested instruction and there was no error in the submission of the requested definition with the added phrase, as above set out. Goolsbee v. Texas & N. O. R. Co., 149 Tex. 445, 234 S.W.2d 407; 150 Tex. 528, 243 S.W.2d 386.

There was no error in changing the word "executed" as requested by defendant to "accepted".

The requested issue contained the words "It did accept it" or "It did not accept it," and the change in the wording of the issue was the correction of a clerical error. No objection was made to the corrected issue.

There was no error shown of any prejudice to defendant in the refusal of the Court to require plaintiff's counsel to discuss Special Issues Nos. 2 and 3 in the opening argument.

Rule 269(h), Texas Rules Civ.Proc., provides for arguments and only requires the counsel in the opening argument to present his whole case as he relies on it, both of law and facts, and shall be heard in the concluding argument only in reply to the counsel on the other side. The plaintiff was not relying on Special Issue No. 5, this being a defense issue. Special Issue No. 2 was an issue requested by defendant in which he was relying on accord and satisfaction and was not requested by plaintiff.

There is no showing that plaintiff's counsel argued in his closing argument any

of his issues that he had not previously argued in his opening argument.

■ We believe that interest was allowable as compensation for the detention of money and not as a punitive measure against the debtor. The debt has not been paid and there is only the cashier's check, not money, in the hands of the Court and the judgment of the Court is the subject of this appeal. 47 C.J.S. Interest § 55, p. 67.

It was not error for the Court to deny defendant a recovery for portions of drilling costs.

■ In answer to Special Issue No. 5 the jury found the cost of drilling, equipping and completing a well at the original location would be $60,000.00 and by reason of such answer the defendant claims damages amounting to 5/8ths or 5/12ths of $60,000.00. The defendant could not recover damages based on the jury's finding. Damages for failure to drill a well are not measurable by the amount it would cost. Riddle v. Lanier, 136 Tex. 130, 145 S.W.2d 1094.

There was no proof made to show that a well drilled at the original location would have been productive or would have increased the value of defendant's part of the working interest, or that there was any geological difference between the two locations. Hardwick v. Jackson, Tex.Civ. App., Dallas, 315 S.W.2d 440.

■ By its ninth counterpoint appellee asserts that estoppel and waiver were proved as a matter of law. Since the testimony concerning the contract between the parties, the subsequent agreement and the conduct of the appellant in visiting the relocation, observing the drilling of the well and taking over the well for completion as operator has been hereinabove recited, which we do not restate, we believe that Mr. Fain is estopped to refuse payment of his share of the cost of drilling the well and to have waived any objection

he may have had to consent to the change in location. Whether there is a waiver depends on the acts and conduct of the parties subsequent to the making of the contract. 17 C.J.S. Contracts § 492, pp. 994, 995; 10–A Tex.Jur., pp. 565, 568; Bluebonnet Oil & Gas Co. v. Panuco Oil Leases, Inc., Tex.Civ.App., 323 S.W.2d 334, error ref., N.R.E.; Dallas Farm Machinery Co. v. Minneapolis-Moline Co., Tex. Civ.App., 324 S.W.2d 578.

The judgment of the Trial Court is affirmed.

Affirmed.