Opinion filed December 1, 2025



In The

# Eleventh Court of Appeals

_____

## No. 11-23-00222-CV
_____

## SM ENERGY COMPANY, Appellant

## V.

## BUZZARD ROOST FARMS, INC. AND C&L SOLUTIONS, INC., Appellees

**On Appeal from the 118th District Court**
**Howard County, Texas**
**Trial Court Cause No. 53991**

## O P I N I O N

This appeal concerns the interpretation and application of a right of first refusal provision in a Surface Use and Compensation Agreement executed by Appellees, Buzzard Roost Farms and C&L Solutions (the Surface Owners), and an operating company to which Appellant, SM Energy Company, is a successor-in-interest. The trial court found that the provision was ambiguous as to the obligations

that it imposed on SM Energy, and the damages, if any, that the Surface Owners sustained because of SM Energy's failure to comply with the provision. The trial court submitted questions concerning the construction of the provision and the determination of damages to the jury, which found in favor of the Surface Owners on both points and awarded them approximately $9.3 million in damages. In a posttrial proceeding, the trial court awarded attorneys' fees of approximately $1.3 million to the Surface Owners.

SM Energy presents three issues, with sub-parts, on appeal: (1) the trial court erred when it found that the right of first refusal provision was ambiguous, submitted improper questions to the jury in its charge, and did not sign a take-nothing judgment in favor of SM Energy because (a) a right of first refusal only permits the holder of the right to either accept or reject the offer made to a third party, (b) the evidence conclusively established that the Surface Owners would have rejected its offer, and (c) the submitted jury questions were legally flawed or there was legally insufficient evidence to support their submission; (2) alternatively, the trial court erred when it submitted Question No. 6 to the jury and signed a judgment in favor of the Surface Owners for three elements of damages because (a) the "value of the wells" damage award constituted an impermissible double recovery, and is not supported by legally or factually sufficient evidence, and (b) the award for skim oil royalties is not supported by legally sufficient evidence; and (3) because of these errors, the trial court erred when it awarded attorneys' fees to the Surface Owners.

For the reasons expressed below, we affirm in part, we reverse and render in part, and we reverse and remand in part.

## I. *Introduction*

The pertinent language of the right of first refusal granted in the parties' agreement is as follows: "However, should Operator [SM Energy] choose to drill a Saltwater Disposal Well within 5 miles of the Surface Lands, Operator shall give

Surface Owner first right of refusal to have said Salt Water Disposal [Well] placed on the Surface Lands or other lands adjacent thereto which are owned by Surface Owner." As stated, this right concerns the placement of a saltwater disposal (SWD) well on the Surface Owners' property, should SM Energy choose to drill one within five miles of the Surface Lands. As discussed below, it is a constraint on the use of the land and the business decisions of an oil and gas operator, rather than a constraint on the alienation of real property.

Nevertheless, the well-settled principles that govern the application of the right of first refusal dictate the outcome here. As with any contractual provision, we begin our analysis and construction of it by reviewing the language that the parties used to express their objective intent. As applied, this leads us to only one permissible interpretation: the operator (SM Energy) was obligated to offer to drill and place on the Surface Lands, or other adjacent land owned by the Surface Owners, any SWD well that it chose to drill within five miles of the Surface Lands. SM Energy concedes that it failed to do so. Further, SM Energy's analysis of right of first refusal principles is misplaced. As we explain, the controlling language of this provision precludes SM Energy's preferred interpretation of its obligations to the Surface Owners.

SM Energy acquired the operator that originally executed this agreement with the Surface Owners and it assumed the obligations expressed in the agreement. "[F]ail[ing] to notice the right of first refusal provision [stated in] (Paragraph 2(e)) in the [a]greement," SM Energy evaluated its options for saltwater disposal in Howard County by comparing the cost of (1) drilling SWD wells on local properties and paying fees to the landowners versus (2) purchasing local properties on which to drill SWD wells, thereby avoiding the payment of disposal fees and other costs. Because SM Energy found the second option to be more economical, it purchased

3

two tracts from local landowners and drilled two SWD wells. Those wells were drilled within five miles of the Surface Lands.

SM Energy does not contend that the right of first refusal is unenforceable. Nor does it dispute that it (1) chose to drill SWD wells within five miles of the Surface Lands, and (2) did not offer the Surface Owners a right of first refusal to have these wells placed on the Surface Lands or other lands that they owned. Nevertheless, SM Energy insists that the Surface Owners sustained no damages because they would have rejected the terms of the only offer that SM Energy would have extended to them to drill any SWD well on the Surface Lands—that is, an offer to purchase the Surface Owners lands and then drill SWD wells.

The Surface Owners, on the other hand, maintain that they would have accepted a legitimate offer, that is, an offer to drill SWD wells on land that they own. They contend that an offer to drill that was conditioned on a sale of the very property upon which drilling would occur is beyond the scope of the right of first refusal, and that such a construction would deprive them of the benefit of their bargain—the right to first have an SWD well drilled on their lands should the operator choose to drill one within the designated five-mile radius. Under SM Energy's interpretation, the Surface Owners must sell their land to exercise the right to have SM Energy's SWD wells drilled there, otherwise the right is lost.

## II. *Background*

### A. *The Origins of This Dispute*

The Surface and Subsurface Use and Compensation Agreement that is the genesis of this dispute defines the real property that is subject to it as the "Surface Lands," more fully described as "W/2 NW/4 of Section 6 of Block 33, Township 1 North T. & P. Ry. Co. Survey, in Howard County, Texas."[1] The Surface Owners

---

[1]The record shows that the Surface Owners also own the entire north half of Section 6.

own the Surface Lands and entered into this agreement with JPM EOC Opal, LLC, SM Energy's predecessor-in-interest. The agreement identifies JPM as the "Operator" and the Surface Owners as the fee owner of the surface estate, and it recites that the Operator "desires to conduct oil and gas operations" including "the production, storage, treatment and sale of oil and gas hydrocarbons produced from adjacent horizontal wells." The agreement, which is comprised of sixteen paragraphs, outlines the terms, conditions, payment obligations, and applicable covenants. Paragraph 2(e) of the agreement—the right of first refusal provision—is reproduced below in full:

> e. **Lessee shall not dispose of any salt water in, on or under the leased premises without prior written authorization from Surface Owner.** Without such prior written authorization from Surface Owner, all salt water produced from the Lands must be removed by Operator. However, should Operator choose to drill a Saltwater Disposal Well within 5 miles of the Surface Lands, Operator shall give Surface Owner first right of refusal to have said Salt Water Disposal placed on the Surface Lands or other lands adjacent thereto which are owned by Surface Owner.

SM Energy later acquired JPM and assumed JPM's obligations under this agreement. It is undisputed that SM Energy was unaware of the agreement's right of first refusal provision.[2] SM Energy eventually purchased two parcels of land within a five-mile radius of the Surface Lands; each parcel consisted of over 300 acres, and SM Energy paid the landowners $5,500 per acre and $5,000 per acre, respectively. On these two parcels, SM Energy drilled two SWD wells—the Hydra and the Delphin.

Sometime later, the Surface Owners became aware that SM Energy had drilled two SWD wells within a five-mile radius of the Surface Lands, and they sent a demand letter to SM Energy requesting damages. SM Energy thereafter filed suit and sought a declaration that the provision was invalid and unenforceable or,

---

[2]SM Energy also does not contend that it was excused from its obligations under the agreement.

alternatively, that it was ambiguous. In response, the Surface Owners filed a counterclaim for breach of contract and sought damages.

B. *The Trial Court Determines that the Provision is Enforceable*

The parties engaged in protracted summary judgment practice. First, the parties filed cross-motions for summary judgment that addressed the enforceability and the alleged breach of the right of first refusal provision. SM Energy moved for summary judgment arguing that the provision was unenforceable because it lacked material terms. The Surface Owners responded and contended that because the provision is "forward-looking," the application of such a provision cannot be known until the preferential right ripens under both the terms of the provision itself and the notice from the grantor of the preferential right of an intent to engage in the activity that triggers the right. SM Energy replied that because it drilled the SWD wells on land it owned, no third-party offer existed that dictated the terms of the right of first refusal.

The Surface Owners moved for summary judgment on their breach-of-contract counterclaim, which included a request that the trial court find that the provision was enforceable. In response, SM Energy argued that there can be no breach when a contractual provision is unenforceable, the necessary conditions precedent had not been satisfied, and, alternatively, that material fact issues existed as to whether SM Energy was excused from performance. After a hearing, the trial court denied SM Energy's motion and granted the Surface Owners' motion in part and denied their motion in part. In its order, the trial court stated that the right of first refusal provision was enforceable, but that "fact issues exist as to the breach" of the provision.

C. *The Trial Court Determines the Triggering Event*

In a second round of cross-motions for summary judgment, the parties disputed the meaning of the provision, specifically regarding which event or activity

triggered the right of first refusal to ripen into an enforceable preferential option. SM Energy contended that the provision was tied to the operator's disposal of saltwater that was produced on the Surface Lands only, and because none had been produced from the Surface Lands, the provision had not been triggered. The Surface Owners contended that the right of first refusal was triggered when SM Energy chose to drill an SWD well within five miles of the Surface Lands, with no further qualification. After a hearing, the trial court denied SM Energy's motion, granted the Surface Owners' motion, and ordered that, under the terms of the provision, SM Energy's decision to drill an SWD well within five miles of the Surface Lands triggered the right of first refusal.

At some point, SM Energy extended an offer to the Surface Owners to purchase the Surface Lands for $5,500 per acre, the greater of the two purchase prices through which SM Energy had acquired the property on which it drilled the Hydra and Delphin wells. The Surface Owners did not respond to this offer, and they testified at trial that they would not have agreed to sell the Surface Lands.

SM Energy filed a third motion for partial summary judgment regarding the provision. In this motion, SM Energy contended that it had fulfilled its obligations under the provision because (1) it extended an offer to the Surface Owners based on the same terms to purchase the Surface Lands that SM Energy had offered to third parties—the same third parties through which SM Energy had previously acquired the properties and on which it drilled the Hydra and Delphin wells, and (2) the Surface Owners refused to accept this offer. SM Energy also contended, alternatively, that if the provision was breached, the Surface Owners' damages were limited to the same terms that SM Energy had offered to third parties on whose property the SWD wells were drilled.

In response, the Surface Owners pointed out that even the referenced farm and ranch contracts contained a special provision that SM Energy and the third-party

7

landowners would negotiate in good faith an SWD agreement at market royalty rates, if the land purchases did not close. In other words, and according to the Surface Owners, the land purchases themselves were not an essential term upon which SM Energy drilled the Hydra and Delphin wells, even in their third-party land purchases. Rather, as the provision states, the Surface Owners' first refusal right concerned the drilling of any SWD well within five miles of the Surface Lands. Moreover, the offer to purchase the Surface Owners' property did not contain the same terms that were extended to the third-party landowners because it did not include a special provision to negotiate an agreement to drill an SWD well at market royalty rates if the land purchase did not close. The Surface Owners asserted that material fact issues precluded the grant of summary judgment in favor of SM Energy with respect to the "terms" upon which it had drilled the Hydra and Delphin wells because they were "self-developed," and the damages, if any, was a fact question for the jury to determine. The trial court agreed, and after a hearing, it denied SM Energy's motion and found that fact issues existed as to the breach of the provision.

D. *The Rule 248 Motions*

Finally, before trial, the parties filed motions pursuant to Rule 248 of the Texas Rules of Civil Procedure seeking the resolution of pending questions of law. *See* TEX. R. CIV. P. 248. In their motion, the Surface Owners requested that the trial court find that: (1) the bargain of the right of first refusal was to have "said saltwater disposal well" placed on land that the Surface Owners owned; (2) SM Energy's offer to purchase the Surface Owners lands did not satisfy its obligations under the provision; and (3) SM Energy was obligated under the right of first refusal, regardless of its alleged lack of knowledge of the right.

In its motion, SM Energy requested that the trial court find that: (1) the Surface Owners' right of first refusal entitled them to an offer to have an SWD well drilled and placed on their lands based on the same terms that SM Energy had offered

third-parties to drill and place the Hydra and Delphin wells; (2) the Surface Owners were required to prove they were ready, willing, and able to accept the same terms that SM Energy had offered to drill and place the Hydra and Delphin wells—if not, their claims were moot; and (3) if the Surface Owners sought to avoid the terms offered by SM Energy to drill and place the Hydra and Delphin wells, they were required to prove that those terms were not commercially reasonable, imposed in bad faith, and specifically designed to defeat the right of first refusal.

At the hearing on these motions, the trial court determined that the right of first refusal provision was ambiguous as to "what did the first right of refusal entail, what did it require, and what are the damages as a result of that breach." Thus, the trial court denied both parties' Rule 248 motions.

Prior to trial, the trial court sent a letter to the parties, the purpose of which was to provide more clarity regarding the pending issues. In that correspondence, the trial court informed the parties that it would submit a jury instruction that confirmed the rulings it had made at the hearing on the parties' Rule 248 motions—namely, that the right of first refusal "is ambiguous as to what did it require of SM [Energy], and what are the damages, if any, as a result of SM Energy's failure to comply."

### E. *The Jury Trial and the Trial Court's Charge*

The parties proceeded to a jury trial on the contested issues, and the trial court's charge included seven questions for the jury to consider. The first two questions asked the jury to determine the parties' intent with respect to the right of first refusal. These questions, and the jury's answers to them, are reproduced below:

9

Answer "yes" to either Question 1 or Question 2.

QUESTION 1:

Did the parties intend that the Operator was required to offer Surface Owners the opportunity to have any salt water disposal that Operator chose to drill within five miles of the Surface Lands placed on the Surface Lands or other lands adjacent thereto owned by Surface Owners?

Answer "Yes" or "No."

Answer: _Yes_

Question 2:

Did the parties intend that SM Energy Company offer Surface Owners the same terms and conditions accepted by a third party and upon which SM Energy chose to drill the Hydra and Delphin wells?

Answer "Yes" or "No."

Answer: _No_

Based on their answers to Question Nos. 1 and 2, the jury was asked to determine whether SM Energy had complied with the right of first refusal (Question No. 3). The remaining four questions were conditioned on which construction of the right of first refusal the jury chose: if the jury answered "Yes" to Question No. 1—which they did—and also found that SM Energy had not complied with the right of first refusal by answering "Yes" to Question No. 3—which they did— Question No. 4 asked the jury to determine whether the "Surface Owners were ready, willing, and able to accept [the] placement of the Hydra and Delphin SWDs on the Surface Lands or other lands adjacent thereto which are owned by [the] Surface Owners[.]" The jury was then asked if it found that the Surface Owners were ready, willing, and able to accept those terms, to determine the damages, if any, that the Surface Owners had sustained (Question No. 6). These questions, and the jury's answers to them, are reproduced below:

**QUESTION NO. 3.**

Did SM Energy Company fail to comply with Section 2(e) of the Surface and Subsurface Use and Compensation Agreement?

Answer "Yes" or "No."

Answer: ___Yes___

If you answered "Yes" to Questions 1 & 3, then answer the following question. Otherwise, do not answer the following question.

**QUESTION NO. 4:**

Do you find that Surface Owners were ready, willing, and able to accept placement of the Hydra and Delphin SWDs on the Surface Lands or other lands adjacent thereto which are owned by Surface Owners?

Answer "Yes" or "No."

Answer: ___Yes___

**QUESTION NO. 6:**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Surface Owners for their damages, if any, that resulted from SM Energy's failure to comply with paragraph 2(e) of the Surface Use and Compensation Agreement?

> If you find from a preponderance of the evidence that when the Agreement was signed, the parties intended that, if Surface Owners exercised the first right of refusal, Operators would pay landowners (1) a disposal fee to operate a Salt Water Disposal on a landowner's property, or (2) that landowners typically receive a portion of the value of the Skim Oil collected from the saltwater disposed of in a Salt Water Disposal on the landowner's property, or both, you may consider those findings in your answer.

> You are instructed that a party who breaches a contract cannot escape liability because it may be impossible to state or prove a perfect measure of damages if there is data from which damages may be ascertained with a reasonable degree of certainty.

11

Consider the following elements of damages, if any, and none other.

Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any.

The value of two Saltwater Disposals placed on the Surface Lands: $ 4,982,043.68

Disposal fees, if any, reasonably certain to have been recovered by the Surface Owners to date attributable to two Saltwater Disposal Wells, had they been drilled on the Surface Lands or Other Lands Adjacent Thereto which are owned by Surface Owners.
$ 2,898,358.50

Disposal fees, if any, reasonably certain to be recovered by the Surface Owners in the future attributable to two Saltwater Disposal Wells, had they been drilled on the Surface Lands or Other Lands Adjacent Thereto which are owned by Surface Owners.
_____0_____

Skim oil revenue, if any reasonably certain to have been recovered by the Surface Owners to date attributable to two Saltwater Disposal Wells, had they been drilled on the Surface Lands or Other Lands Adjacent Thereto which are owned by Surface Owners.
$ 1,449,179.00

Skim oil revenue, if any, reasonably certain to be recovered by the Surface Owners in the future attributable to two Saltwater Disposal Wells had they been drilled on the Surface Lands or Other Lands Adjacent Thereto which are owned by Surface Owners.
_____0_____

On the other hand, if the jury answered "Yes" to Question Nos. 2 and 3, Question No. 5 asked the jury to determine whether the "Surface Owners were ready, willing, and able to accept the same terms and conditions upon which SM Energy Company chose to drill the Hydra and Delphin SWDs." Question No. 7 then asked the jury to determine the damages, if any, that the Surface Owners had sustained if the jury answered Question No. 5 in the affirmative. Question Nos. 5 and 7 are reproduced below:

12

**QUESTION NO. 5:**

Do you find that Surface Owners were ready, willing, and able to accept the same terms and conditions upon which SM Energy Company chose to drill the Hydra and Delphin SWDs?

Answer "Yes" or "No."

Answer: _____

If you answered "Yes" to Question 5, then answer the following question. Otherwise, do not answer the following question.

**QUESTION NO. 7:**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Surface Owners for their damages, if any, that resulted from SM Energy's failure to comply with paragraph 2(e) of the Surface Use and Compensation Agreement?

Consider the following elements of damages, if any, and none other.

Do not add any amount for interest on damages, if any.

> The amount which would restore the Surface Owners to the economic position they would have been in had the Agreement been fully performed. $~~\$~4,329,581.16~$

At the charge conference, the Surface Owners asserted the following objections to the trial court's charge: (1) the submission of Question Nos. 1 and 2 was improper because the right of first refusal provision was unambiguous, and its meaning should be determined as a matter of law by the trial court, not factually by the jury; (2) the submission of Question No. 2 was improper because (a) it constituted an improper statement of the law, and (b) to the extent this question was submitted, it should be qualified with appropriate instructions that incorporated the *West Texas Transmission*[3] factors; (3) the submission of Question No. 3 was

---

[3]*W. Tex. Transmission, L.P. v. Enron Corp.*, 907 F.2d 1554, 1562 (5th Cir. 1990).

13

improper because (a) it could and should be decided as a matter of law by the trial court, and not factually by the jury, and (b) SM Energy failed to comply with the provision as a matter of law; and (4) the submission of Question No. 5 was an improper statement of the law.

SM Energy objected to the form and submission of Questions Nos. 1, 4, and 6 on the basis that they did not conform to the legal definition of a right of first refusal and invited the jury to find that "an unenforceable agreement to agree" existed. SM Energy further objected to several specific components of Question No. 6 as being legally incorrect, unnecessary, a comment on the weight of the evidence, and because there was no evidence to support the damage elements of the value of the wells or the past and future volume and value of skim oil recovered from the Hydra and Delphin wells. The trial court overruled all charge objections asserted by the parties.

The jury was charged, answered "Yes" to Question Nos. 1, 3, and 4, and awarded damages to the Surface Owners in the following amounts:

- $4,982,043.68 for the value of the two SWD wells placed on the Surface Lands;

- $2,898,358.50 in disposal fees reasonably certain to have been recovered by the Surface Owners to date that were attributable to the two SWD wells, had they been drilled on the Surface Lands; and

- $1,449,179 in skim oil revenue reasonably certain to have been recovered by the Surface Owners to date that were attributable to the two SWD wells, had they been drilled on the Surface Lands.

After a posttrial proceeding, the trial court awarded the Surface Owners $1,352,971.48 in attorneys' fees.

SM Energy filed a motion for judgment notwithstanding the verdict and a motion to disregard the jury's findings, arguing that the trial court should disregard the jury's answers to Question Nos. 1 and 3 because the right of first refusal was

unenforceable as a matter of law. Alternatively, SM Energy contended that the trial court should disregard the jury's answer to Question No. 6 as it related to the value of the two SWD wells drilled on the Surface Lands because it was not a recoverable measure of damages, it conflicted with the part of Question No. 6 regarding disposal fees, and no evidence was presented to support the jury's answer as to the value of the SWD wells. SM Energy also contended that the trial court should disregard the jury's answer to Question No. 6, as it pertained to skim oil royalties, because no evidence was presented to support the jury's answer to that question. As such, SM Energy requested that the trial court sign a take-nothing judgment in its favor, or, alternatively, sign a judgment that limited the damages awarded to the Surface Owners to only the disposal fee royalties. The trial court denied SM Energy's motions.

The trial court signed a final judgment in accordance with the jury's verdicts, the jury's damage findings, and its attorneys' fee award, and entered a declaration consistent with the Surface Owners' construction of the right of first refusal. The trial court also awarded the Surface Owners prejudgment interest that exceeded $2,770,000. SM Energy subsequently filed a motion for new trial, which was overruled by operation of law. Tex. R. Civ. P. 329b(c). This appeal followed.

### III. *The Right of First Refusal*

In its first issue, SM Energy contends that the trial court erred when it found that the right of first refusal provision was ambiguous, and in turn submitted improper questions for the provision's determination and other related matters to the jury, and when it refused to sign a take-nothing judgment in favor of SM Energy because (a) a right of first refusal only permits the holder of that right to either accept or reject the offer made to a third party, (b) the evidence conclusively established that the Surface Owners would have rejected SM Energy's offer, had one been made, and (c) the jury questions were legally incorrect or there is legally insufficient

15

evidence to support their submission.  Notably, SM Energy does not challenge the trial court's order that the provision is an enforceable right of first refusal.

The primary focus of SM Energy's argument concerns its interpretation of the rights of first refusal principles.  The core issue here is how to determine the terms and conditions that SM Energy was obligated to offer the Surface Owners, and whether, to exercise their right, the Surface Owners were required to unconditionally accept such terms and conditions—the remaining contentions flow from there.[4] Thus, SM Energy contends that the trial court should have found as a matter of law that the provision unambiguously required SM Energy to only offer the Surface Owners the same terms and conditions that it had offered the third-party landowners to purchase their property for the purpose of drilling the Hydra and Delphin wells.

A.  *General Principles–The Right of First Refusal*

"A right of first refusal, also known as a preemptive or preferential right, empowers its holder with a preferential right to purchase the subject property on the same terms offered by or to a bona fide purchaser."[5] *Archer v. Tregellas*, 566 S.W.3d

---

[4]The Surface Owners contend that SM Energy (1) failed to object to the trial court's submission of the provision based on ambiguity, and (2) invited any alleged error in its submission.  They also contend that SM Energy judicially admitted that no third-party offer—the terms of which they were purportedly obligated to accept unconditionally—existed.  The trial court rejected this judicial-admission argument, and we agree with the reasoning expressed in its letter ruling on the matter.  And for the reasons expressed in SM Energy's reply brief, we do not find its preservation and invited error points persuasive.

[5]"[A] bona fide offer is one that is made in good faith and which, on acceptance, becomes a valid and binding contract enforceable by any party to it."  *Liberty Bankers Life Ins. Co. v. AIL Inv., L.P.*, No. 02-23-00212-CV, 2024 WL 2854776, at *10 (Tex. App.—Fort Worth, June 6, 2024, pet. pending) (mem. op.); *see Lede v. Aycock*, 630 S.W.2d 669, 674 (Tex. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.); *Jones v. Riley*, 471 S.W.2d 650, 658–59 (Tex. App.—Fort Worth 1971, writ ref'd n.r.e.); *Jimmie Luecke Children P'ship, Ltd. v. Droemer*, No. 03-20-00096-CV, 2022 WL 243162, at *2–3 (Tex. App.—Austin Jan. 27, 2022, pet. denied) (mem. op.); *see also Baldwin v. New*, 736 S.W.2d 148, 152 (Tex. App.—Dallas 1987, writ denied).  In its recent decision in *Liberty Bankers*, the Second Court of Appeals rejected an argument that a "bona fide offer" also must be made in an arm's length transaction that results in a change of control over the property; the court reasoned that, although other jurisdictions and legal commentators have supported the acceptance of this third component, Texas courts have routinely defined "bona fide offer" without it.  2024 WL 2854776, at *10.  The court also noted that its definition comported with the plain meaning of the term "bona fide," and that the subject deed specifically provided that neither a foreclosure

281, 286–87 (Tex. 2018) (quoting *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 644 (Tex. 1996)). Generally, a right of first refusal requires that the grantor notify the holder of this right of his intent to sell the property and then to first offer the property to the holder based on the same terms and conditions that were offered by or to a third party. *Id.* at 287 (first citing *Tenneco*, 925 S.W.2d at 644; and then citing *Navasota Res., L.P. v. First Source Tex., Inc.*, 249 S.W.3d 526, 532 (Tex. App.—Waco 2008, pet. denied)). "When the grantor communicates those terms to the holder, the right 'ripens into an enforceable option.'" *Id.* (quoting *FWT, Inc. v. Haskin Wallace Mason Prop. Mgmt., L.L.P.*, 301 S.W.3d 787, 793 (Tex. App.—Fort Worth 2009, pet. denied)).

"The holder may then elect to purchase the property according to the terms of the instrument granting the first-refusal right and the third party's offer, or decline to purchase it and allow the owner to sell to the third party." *Id.* (citing *Jarvis v. Peltier*, 400 S.W.3d 644, 652 (Tex. App.—Tyler 2013, pet. denied)); *FWT*, 301 S.W.3d at 793 ("The terms of the option are formed by both the provisions granting the preferential right and the terms and conditions of the third-party offer presented to the rightholder.") (citing *City of Brownsville v. Golden Spread Elec. Coop., Inc.*, 192 S.W.3d 876, 880 (Tex. App.—Dallas 2006, pet. denied)).

Once the holder of the right has received notice of the intent to sell based on the terms contained in the third-party offer, the terms of the option cannot be changed for as long as the option is binding on the property owner. *FWT*, 301 S.W.3d at 793 (citing *Golden Spread Elec. Coop.*, 192 S.W.3d at 880). "The rightholder's exercise of the option to purchase must be positive, unconditional, and unequivocal." *Id.* at 794; *Tex. State Optical, Inc. v. Wiggins*, 882 S.W.2d 8, 10–11 (Tex. App.—Houston

---

sale nor a sale to an affiliate triggered the appellants' right of first refusal. *Id.* (citing BLACK'S LAW DICTIONARY (11th ed. 2019)).

[1st Dist.] 1994, no writ).  A purported acceptance that contains a new demand, proposal, condition, or modification of the terms of the offer is not an acceptance, but rather a rejection.  *FWT*, 301 S.W.3d at 794; *Tex. State Optical*, 882 S.W.2d at 11.

B.  *Exercise of the Option*

Within this framework, "[d]isputes often arise over whether a rightholder properly exercises the ripened option to purchase."  *Archer*, 566 S.W.3d at 287 n.7; *see Cardoon, LLC v. JBG Organic Holdings, LLC*, No. 07-23-00035-CV, 2023 WL 5156676, at *3 (Tex. App.—Amarillo Aug. 10, 2023, no pet.) (mem. op.) (examining cases).  The matter before us demonstrates a somewhat unique circumstance because the right of first refusal concerns something other than an option to purchase real property.  Nevertheless, the principles that guide our analysis are the usual ones: "namely, the law pertaining to the right of first refusal [and] the law relating to contract formation."  *Liberty Bankers*, 2024 WL 2854776, at *6.

Typically, a right of first refusal is triggered, or "ripens into an enforceable option," when the property owner communicates the terms of a third party's offer to the rightholder.  *Archer*, 566 S.W.3d at 287 (quoting *FWT*, 301 S.W.3d at 793).  A grantor commits a contractual breach if he sells the burdened property without first offering to sell it to the rightholder on the same terms as the third-party offer.  *Id.* (citing *Riley v. Campeau Homes (Tex.), Inc.*, 808 S.W.2d 184, 188 (Tex. App.—Houston [14th Dist.] 1991, writ dism'd)); *see Martin v. Lott*, 482 S.W.2d 917, 920 (Tex. App.—Dallas 1972, no writ) ("Such a promise, when supported by consideration, creates a 'pre-emptive right' . . . under which a sale or transfer contrary to such right has the effect of an offer and confers such a power of acceptance.") (citing 1A Arthur Linton Corbin, *Corbin on Contracts* § 261 (1963 ed.)).  In the instance of such a breach, the rightholder may seek specific

performance or money damages. *Archer*, 566 S.W.3d at 287; *see Martin*, 482 S.W.2d at 922.

Here, the trial court found that the right of first refusal was triggered by "SM Energy's decision to drill a Saltwater Disposal Well within 5 miles of the Surface Lands." We agree. Further, the right was breached by this activity. It was the express subject of the right, and SM Energy even concedes that they did not extend any offer to the Surface Owners to drill and place the SWD wells on either the Surface Lands or other adjacent land owned by the Surface Owners. *See McMillan v. Dooley*, 144 S.W.3d 159, 172 (Tex. App.—Eastland 2004, pet. denied) ("[T]here is no dispute that the preferential purchase provisions were initially breached because the leases were conveyed without being offered [to the rightholders] prior to the conveyance."); *see also Archer*, 566 S.W.3d at 287; *Martin*, 482 S.W.2d at 920. But "[t]he initial breach . . . [is] not necessarily [outcome-determinative] of the parties' dispute." *McMillan*, 144 S.W.3d at 172. When the rightholder learns of an act in violation of his right, he may either accept or reject an offer, just as if he had been given proper notice. *Id.* (citing *A.G.E., Inc. v. Buford*, 105 S.W.3d 667, 673 (Tex. App.—Austin 2003, pet. denied); *Martin*, 482 S.W.2d at 920.

SM Energy does not challenge the trial court's determination that the right was triggered; instead, as we explain, SM Energy disputes the exact *content* of the triggering event—that is, whether its purchases of land from third parties are part of the triggering event—because of the implications associated with the determination of whether the Surface Owners properly exercised their option under the right of first refusal. Therefore, because SM Energy did not extend an offer to the Surface Owners, we must ascertain the terms and conditions that it *should have offered* them. *Archer*, 566 S.W.3d at 287; *Martin*, 482 S.W.2d at 920.

SM Energy contends that because it chose to drill the SWD wells on land that it purchased from others for that express purpose, the purchase of that land constituted both its "choice" within the meaning of the agreement to drill the SWD wells and the third-party offers it should have extended to the Surface Owners. On the other hand, the Surface Owners assert that the express terms of the right of first refusal address the drilling of SWD wells on land that they own, and that the right was not triggered by SM Energy's purchase of real property from others in the area, but rather by its choice to drill the SWD wells on lands that were not owned by the Surface Owners.

Thus, the disposition of this appeal turns on whether SM Energy's purchase of real property from third parties constitutes part of the offer that it *should have* extended to the Surface Owners. The answer to this question depends on the scope and interpretation of the right of first refusal.[6]

C. *Contract Interpretation*

We and several of our sister courts have uniformly held that because preferential rights are bargained-for contractual provisions, we must examine the contractual language that grants this right to determine their scope. *Lamar*

---

[6]SM Energy also argues that the Surface Owners' "committed to be bound by the terms SM Energy negotiated with a third party" because the Surface Owners argued that the provision was not unenforceable for lack of essential terms, as rights of first refusal inherently lack complete terms "until the event triggering the right occurs" and "the rightholder must elect to either accept on the terms communicated, or decline." The Surface Owners stated, "Here, the terms of the offer are defined by the terms upon which [SM Energy] drilled the SWDs. In other words, the terms due the right-holder are the terms upon which the triggering event occurred."

We do not agree that this argument constitutes a commitment to be bound by SM Energy's interpretation of the provision's obligations. It was merely a general statement of the law of rights of first refusal that was made by trial counsel during summary judgment proceedings concerning the enforceability of the provision, which SM Energy does not challenge on appeal. Moreover, as we discuss below, although SM Energy's act of drilling the SWD wells on property it purchased from third parties was the "triggering event," it is undisputed that SM Energy never extended an offer to the Surface Owners to drill SWD wells on the Surface Lands. The issue that we must address in this appeal largely centers on what terms should be imputed to SM Energy's choice to drill SWD wells within five miles of the Surface Lands without first complying with its obligation under the right.

*Advantage Outdoor Co., L.P. v. LaCore Enters., LLC*, No. 05-23-00210-CV, 2024 WL 5251964, at *6 (Tex. App.—Dallas Dec. 31, 2024, no pet. h.) (mem. op.) (citing *Startex First Equip., Ltd. v. Aelina Enters., Inc.*, 208 S.W.3d 596, 600–02 (Tex. App.—Austin 2006, pet. denied)); *see Cruz Azul Futbol Club A.C. v. World Soccer Enter., LLC*, No. 05-23-01321-CV, 2024 WL 5244620, at *4 (Tex. App.—Dallas Dec. 30, 2024, no pet.) (mem. op.); *Reagan Nat'l Advertising of Austin, LLC v. Pfeiffer*, No. 07-24-00129-CV, 2024 WL 4363343, at *3 (Tex. App.—Amarillo Sept. 30, 2024, no pet.) (mem. op.); *Cardoon*, 2023 WL 5156676, at *2–3; *Mr. W Fireworks, Inc. v. Concho Acquisition Partners, LLC*, No. 04-21-00512-CV, 2023 WL 2592293, at *2 (Tex. App.—San Antonio, Mar. 22, 2023, no pet.) (mem. op.); *see also McMillan*, 144 S.W.3d at 175 ("The details of a particular [preferential purchase] right depend upon the contract between the parties.") (quoting *W. Tex. Transmission*, 907 F.2d at 1562).

Texas endorses a strong public policy that favors the freedom of contract. *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 877 (Tex. 2018) (citing *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016)). Absent compelling reasons, courts must respect and enforce the terms of a contract that the parties have executed freely and voluntarily. *Id.* Generally, parties have the right to contract as they see fit, provided that their agreement does not violate established law or public policy. *Id.*; *Coyote Lake Ranch, LLC v. City of Lubbock*, 498 S.W.3d 53, 59 (Tex. 2016).

Thus, in construing a contract, we look to the language of the parties' agreement to ascertain their objective intent as expressed in the writing. *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764 (Tex. 2018); *Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522, 524 (Tex. 1982) (construing a right of first refusal). A contract is not ambiguous merely because the parties disagree as to its meaning, and it may be ambiguous even if the parties agree that it is not. *URI*, 543 S.W.3d at

763 (citing *Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 787 (Tex. 2017)). Both the presence of an ambiguity and the interpretation of an unambiguous contract are questions of law that we review de novo using well-settled contract-construction principles. *Id.*; *see Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019).

If we determine that the contract's language can be given a certain or definite legal meaning or interpretation when considered as a whole, and because of the objective circumstances surrounding its execution, it is not ambiguous, and we must construe it as a matter of law. *Finley Res., Inc. v. Headington Royalty, Inc.*, 672 S.W.3d 332, 340 (Tex. 2023) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). But if the contract is subject to two or more reasonable interpretations after the pertinent rules of construction have been applied, the contract is ambiguous, and a fact issue as to the parties' intent exists. *Id.* (citing *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011)). In determining the parties' objective intent, we "consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 888–89 (Tex. 2019) (quoting *Coker*, 650 S.W.2d at 393); *see U.S. Polyco, Inc. v. Tex. Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 389 & n.2 (Tex. 2023) ("That contract interpretation is an 'objective' endeavor is a proposition [the Texas Supreme Court has] stated in countless opinions.").

When the trial court determines that a contract is ambiguous, the contract's meaning becomes a fact question for the jury to decide. *Barrow-Shaver*, 590 S.W.3d at 480. But, if a contract is unambiguous, the trial court errs if it submits questions to the jury that require the jury to determine the contract's meaning, rather than the trial court construing it as a matter of law. *Id.* Such error is harmless, however, if the jury found as the trial court should have. *Id.*; *see* TEX. R. APP. P. 44.1(a)(1).

22

We begin our analysis by examining the ordinary meaning of the contractual language. *See, e.g.*, *Lamar Advantage Outdoor*, 2024 WL 5251964, at *6 (citing *Startex*, 208 S.W.3d at 600–02). "We will give a contract language its plain, grammatical meaning unless it 'would clearly defeat the parties' intentions.'" *Barrow-Shaver*, 590 S.W.3d at 479 (quoting *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002)). In this case, the right of first refusal that SM Energy granted to the Surface Owners provides that:

> [1] should Operator [SM Energy] choose to drill a Saltwater
> Disposal Well
> [2] within 5 miles of the Surface Lands,
> [3] Operator shall give [the] Surface Owner first right of refusal
> [4] to have said Salt Water Disposal [Well] placed on the Surface
> Lands or other lands adjacent thereto which are *owned* by [the]
> Surface Owner.

(emphasis added). This language is clear and unambiguous, and it defines the scope of the right granted by SM Energy to the Surface Owners. With respect to the obligations that this right of first refusal imposes on SM Energy, the scope of the fourth component cannot encompass SM Energy's "self-development" strategy of purchasing real property from third parties for the purpose of drilling and placing SWD wells on land that *SM Energy owns*. In other words, although it may have been the preferable business strategy, SM Energy's choice to purchase land for the purpose of drilling SWD wells within five miles of the Surface Lands triggered, but did not change, its obligations under the right of first refusal terms stated in Paragraph 2(e) of the parties' agreement. The trial court found as much when it signed its order stating that, under this provision, "SM Energy's decision to drill a Saltwater Disposal Well within 5 miles of the Surface Lands triggered Paragraph 2(e)'s right of first refusal in favor of the Surface Owners."

23

This reading is further supported by the context within which this provision is found. *See Brown v. City of Houston*, 660 S.W.3d 749, 754 (Tex. 2023) (holding that "a primary determinant of meaning" is context) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012)). The provision is a part of a "Surface and Subsurface Use and Compensation Agreement" in which the parties are identified as the landowners and the oil and gas operator, who desire to conduct oil and gas activities on the Surface Lands. It is difficult to envision how this right of first refusal could reasonably be read to mean that, as part of the compensation for the operator's use of the surface and subsurface of their land, the Surface Owners would only be entitled to an offer to have any SWD well "placed" on their "Surface Lands," or other adjacent land that they own, on the condition that they agree to sell those lands. *See Finley Res.*, 672 S.W.3d at 340; *Pathfinder*, 574 S.W.3d at 888–89. The compensation bargained for in this agreement unambiguously includes the Surface Owners' right of first refusal regarding SM Energy's choice to drill SWD wells within five miles of the Surface Lands. As such, the rightholders (the Surface Owners) are expressly entitled to an offer to drill such wells on specified lands *that they own*. *See Pathfinder*, 574 S.W.3d at 888–89.

Texas courts have held that the rightholder is not obligated to accept the terms and conditions of a third-party offer that are beyond the scope of the right of first refusal contractual provision. *FWT*, 301 S.W.3d at 801 ("Our review of the case law leads us to conclude that, as a general rule, the holder of a preferential right cannot be compelled to purchase assets beyond the scope of the agreement subject to the preferential right in order to exercise that right."); *accord Hicks v. Castille*, 313 S.W.3d 874, 882 n.5 (Tex. App.—Amarillo 2010, pet. denied); *Navasota Res.*, 249

24

S.W.3d at 535.[7]  To be sure, these decisions primarily concerned whether a rightholder may be compelled to purchase additional assets that exceed the scope of the right of first refusal, or whether the rightholder may compel the grantor to sell him additional property beyond the right's scope.  *See, e.g.*, *FWT*, 301 S.W.3d at 802; *McMillan*, 144 S.W.3d at 179 ("If a rightholder is not permitted to expand his preferential purchase right to include property not covered by the provision, it would be improper for him to be required to accept other property not covered by his preferential purchase right in order to exercise his right.") (citing *Comeaux v. Suderman*, 93 S.W.3d 215, 221 n.2 (Tex. App.—Houston [14th Dist.] 2002, no pet.)); *Hinds v. Madison*, 424 S.W.2d 61, 64 (Tex. App.—San Antonio 1967, writ ref'd n.r.e.) ("We do not see how in any way lessee's option or preference right to purchase a portion of the property sought to be sold can be enlarged to cover other lands owned by lessors, or can in any manner cover anything except the property actually subject to the option.").

But the guiding principle concerns the scope of the right as expressed in the contract's language.  *See Navasota*, 249 S.W.3d at 534–37 (holding that the right of first refusal was triggered by a "package deal" involving the burdened property and

---

[7]The parties dispute whether the application of *West Texas Transmission* was preserved for appellate review.  We and other courts of appeals have not unanimously accepted the holding in *West Texas Transmission*.  *See Cardoon*, 2023 WL 5156676, at *1 (applying *West Texas Transmission* in accordance with the precedent of the Third Court of Appeals, under Rule 41.3 of the Texas Rules of Appellate Procedure, but noting that "[o]ur precedent may actually contradict it."); *see also McMillan*, 144 S.W.3d at 177 ("[T]he factors identified in *West Texas Transmission* have not been unanimously embraced by Texas courts as a correct interpretation of Texas law."); *Abraham Inv. Co. v. Payne Ranch, Inc.*, 968 S.W.2d 518, 524 (Tex. App.—Amarillo 1998, pet. denied); *Tex. State Optical*, 882 S.W.2d at 12; Robert K. Wise, et al., *First-Refusal Rights Under Texas Law*, 62 BAYLOR L. REV. 433, 479–86 (2010) (positing that *West Texas Transmission*'s good-faith exception is tantamount to the imposition of an implied covenant of good faith and fair dealing in all contracts, which is contrary to Texas law).  To the extent that Texas courts have applied *West Texas Transmission*, however, they have done so only as an exception to the general rule that preferential rightholders cannot be compelled to accept terms that exceed the scope of the parties' agreement, and which are subject to the preferential right.  *See Cardoon*, 2023 WL 5156676, at *2–4.  That exception would apply when the preferential right is "expressly" made subject to the same terms and conditions that were offered by or to a prospective third-party purchaser.  *Id.* at *3 (citing *FWT*, 301 S.W.3d at 801–802).  That is not the case here.

additional terms because "[t]o conclude otherwise would permit an owner and prospective purchaser to, in effect, destroy a bargained-for purchase preemption," but concluding that the rightholder was not obliged to adhere to the additional terms of the third-party offer (quoting *Berry–Iverson Co. of N.D. v. Johnson*, 242 N.W.2d 126, 134 (N.D. 1976))); *see also Koopmann*, 547 S.W.3d at 877 (Absent a compelling reason, courts must respect and enforce the terms of a contract that the parties have freely and voluntarily entered.); *Coyote Lake Ranch*, 498 S.W.3d at 59 (Generally, parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy.) (internal quotation marks omitted). Here, the right is a constraint on the use of the land and the business decisions of an oil and gas operator, rather than a constraint on the alienation of real property. *See, e.g.*, *Nat'l Advertising Co. v. Potter*, No. 01-06-01042-CV, 2008 WL 920338, at *2–5 (Tex. App.—Houston [1st Dist.] April 3, 2008, pet. denied) (mem. op.) (interpreting a right of first refusal to renew leases for advertisement billboards if the property owner chose, after termination of the leases, "to rent or use the demised premises for outdoor advertising purposes"); *Wise*, *supra* note 7, at 438–42 (Acknowledging that most first-refusal rights occur in real property transactions, but "a first-refusal right's subject matter can be anything that can be the subject of contracts, including franchise, distributorship, and dealership agreements, shareholder agreements, employment agreements, and joint venture and partnership agreements.") (internal citations omitted).

We conclude that (1) the right of first refusal language in this agreement unambiguously obligates SM Energy to offer to place on the Surface Lands (or other land owned by Surface Owners) any SWD well that it chooses to drill within five miles of the Surface Lands, and (2) SM Energy's strategic business decision to instead own the property on which it chose to drill such wells is beyond the scope of

the right and is not a term or condition that the Surface Owners are required to accept. *See FWT*, 301 S.W.3d at 802; *McMillan*, 144 S.W.3d at 178–79.

### D. *The Trial Court's Charge and Submitted Jury Questions*

With the above in mind, we now address SM Energy's charge error and evidentiary complaints. In the two remaining sub-issues in support of its first issue, SM Energy contends that (1) the evidence conclusively established that the Surface Owners would have rejected any offer it would have made to them, and (2) the jury questions submitted in the trial court's charge were legally incorrect, there is legally insufficient evidence to support their submission, or the jury's answers to these questions are immaterial and should have been disregarded by the trial court.

#### 1. *Standards of Review*

##### a. *Charge Error*

We review an allegation of charge error under an abuse of discretion standard. *Brumley v. McDuff*, 616 S.W.3d 826, 831 (Tex. 2021). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner, without reference to any guiding rules or principles. *Turner v. NJN Cotton Co.*, 485 S.W.3d 513, 522 (Tex. App.—Eastland 2015, pet. denied) (citing *Walker v. Guitierrez*, 111 S.W.3d 56, 62 (Tex. 2003)). If the trial court's charge was erroneous, we must consider whether the error requires a reversal. *Benge v. Williams*, 472 S.W.3d 684, 699 (Tex. App.—Houston [1st Dist.] 2014), *aff'd*, 548 S.W.3d 466 (Tex. 2018).

##### b. *Disregarding Jury Findings*

A trial court's judgment must conform to the pleadings, the nature of the case proved, and the verdict, that is, a trial court should sign a judgment in accordance with the jury's findings. TEX. R. CIV. P. 301. An exception exists when a jury finding is made in response to a question that is "immaterial"; if so, a trial court may disregard a jury finding on an immaterial question when it renders judgment. *See Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994). A jury

question is immaterial when it should not have been submitted,[8] it requires a finding that is beyond the province of the jury, such as a question of law, or it was properly submitted but has been rendered immaterial by other findings. *Id.*

When a trial court's judgment is challenged because the trial court improperly failed to disregard immaterial jury questions that instead required legal determinations, we review the trial court's ruling de novo. *Estate of Manley*, No. 05-24-00043-CV, 2025 WL 2262403, at *10 (Tex. App.—Dallas Aug. 7, 2025, pet. filed) (mem. op.) (citing *Markovsky v. Kirby Tower, LP*, No. 01-10-00738-CV, 2011 WL 5429014, at *2 (Tex. App.—Houston [1st Dist.] Nov. 10, 2011, pet. denied) (mem. op.)); *see Hall*, 292 S.W.3d at 27–28.

### c. *Legal Sufficiency of the Evidence*

When the appellant challenges the legal sufficiency of the evidence that supports an adverse finding on which it did not have the burden of proof at trial, it must demonstrate that there is no evidence to support the adverse finding. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). When reviewing a legal-sufficiency challenge to a jury verdict, we view all the evidence in the light most favorable to the verdict. *Albert v. Fort Worth & W.R.R. Co.*, 690 S.W.3d 92, 97 (Tex. 2024) (citing *City of Keller*, 168 S.W.3d at 807). "We credit favorable evidence if a reasonable juror could do so and disregard contrary evidence unless a reasonable juror could not." *Id.*; *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003); *see Golden Eagle Archery,*

---

[8]A question should not be submitted to the jury when the question is "legally defective" or when the question submits a theory that otherwise fails as a matter of law. *See Fazio v. Cypress/GR Houston I, L.P.*, 403 S.W.3d 390, 394–96 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (holding that a jury question was "legally defective" because it addressed an improper measure of damages); *Soon Phat, L.P. v. Alvarado*, 396 S.W.3d 78, 93 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (holding that a jury question concerning a malicious-prosecution claim should not have been submitted because the claim "was foreclosed as a matter of law"); *Hall v. Hubco, Inc.*, 292 S.W.3d 22, 27–28 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (holding that a jury question on breach of contract should not have been submitted because the alleged contract failed for lack of consideration).

*Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). We cannot substitute our judgment for that of the factfinder if the evidence falls within the zone of reasonable disagreement. *City of Keller*, 168 S.W.3d at 822.

The evidence is legally insufficient to support a finding only if (1) the record discloses a complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the only evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *See Albert*, 690 S.W.3d at 97; *City of Keller*, 168 S.W.3d at 810. "Anything more than a scintilla of evidence is legally sufficient to support the finding." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). More than a mere scintilla of evidence exists when the evidence enables reasonable and fair-minded people to reach different conclusions. *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014). "However, if the evidence is so weak that it only creates a mere surmise or suspicion of its existence, it is regarded as no evidence." *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156 (Tex. 2014).

d. *Factual Sufficiency of the Evidence*

If a party challenges the factual sufficiency of an adverse finding on an issue in which the other party had the burden of proof at trial, the challenging party must demonstrate that there is insufficient evidence to support the adverse finding. *Croucher*, 660 S.W.2d at 58. With a factual-sufficiency challenge, we consider and weigh all the evidence, both that support and contradict the finding. *McLeod v. McLeod*, 644 S.W.3d 792, 806 (Tex. App.—Eastland 2022, no pet.) (citing *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998)). In this regard, we will set aside a verdict "only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust." *Ellis*, 971 S.W.2d at 407. In our analysis, we may not substitute our judgment for that of the factfinder or assess

the credibility of the witnesses or other admitted evidence. *McLeod*, 644 S.W.3d at 806.

### 2. *Analysis – Any Charge Error Was Harmless, and the Evidence is Sufficient to Support the Jury's Findings*

As we have said, a trial court errs when it submits an unambiguous contractual provision to the jury for determination; however, such error is harmless if the jury's finding is what the trial court should have found. *Barrow-Shaver*, 590 S.W.3d at 480; *see* TEX. R. APP. P. 44.1(a)(1). We have concluded that the right of first refusal provision is unambiguous and, because it is, the "ambiguity" determination should not have been submitted to the jury. As such, the trial court erred when it did. Nevertheless, the error is harmless because when the jury answered "Yes" to Question No. 1—"Did the parties intend that the Operator [SM Energy] was required to offer [the] Surface Owners the opportunity to have any salt water disposal that Operator chose to drill within five miles of the Surface Lands placed on the Surface Lands or other lands adjacent thereto owned by [the] Surface Owners?"—they found as the trial court should have.

Question No. 3 asked the jury to determine whether SM Energy failed to comply with the right of first refusal; the jury answered this question in the affirmative. Because we have concluded that the provision is unambiguous, and because it is undisputed that SM Energy did not extend any offer to drill SWD's to the Surface Owners, the jury's finding is correct as a matter of law. *Archer*, 566 S.W.3d at 287 ("A grantor's sale of the burdened property to a third party without first offering it to the rightholder on the same terms constitutes a breach of contract.").

A determination of breach, however, does not necessarily end our inquiry in this context. *See McMillan*, 144 S.W.3d at 172. But the jury's affirmative answer to Question No. 4—which asked whether the "Surface Owners were ready, willing,

and able to accept placement of the Hydra and Delphin SWDs on the Surface Lands or other lands adjacent thereto which are owned by [the] Surface Owners"—does. Because we have rejected SM Energy's interpretation of the right of first refusal provision and the obligations it imposes on SM Energy, we also reject SM Energy's contention that the evidence conclusively establishes that the Surface Owners were *not* ready, willing, and able to accept an offer in accordance with SM Energy's interpretation of the provision. In fact, the undisputed evidence establishes the opposite—Dustin and Logan Gaskins, part owners of Buzzard Roost Farms and C&L Solutions, testified that they would have accepted an offer to drill and place SWD wells on the Surface Lands.

Our conclusion on these points flows from our construction of the scope of the right of first refusal in the parties' agreement. Although the trial court erred when it submitted the interpretation of an unambiguous contractual provision to the jury, this error was harmless because the jury found as the trial court should have. *Barrow-Shaver*, 590 S.W.3d at 480; *see* TEX. R. APP. P. 44.1(a)(1). Relatedly and consequently, SM Energy's arguments concerning charge error, immateriality, and evidence sufficiency are unavailing.

Accordingly, SM Energy's first issue is overruled.

## IV. *Damages*

In its second issue, SM Energy contends, in the alternative, that the trial court erred when it submitted Question No. 6 to the jury and signed a judgment in favor of the Surface Owners for three separate damage elements, because (a) awarding damages for the value of the SWD wells constitutes an impermissible double recovery, (b) the "value of the wells" award is not supported by legally or factually sufficient evidence, and (c) there is legally insufficient evidence to support a finding of skim oil revenues. SM Energy contends that, to the extent we construe that its breach of the right of first refusal provision provides a basis for the Surface Owners

31

to recover damages, the only damages element that can withstand scrutiny is the disposal fee award of $2,898,358.50. We agree with SM Energy, in part, and conclude that the "value of the wells" damages award is an improper one.

When a right of first refusal is breached, rightholders frequently seek the remedy of specific performance. *See Archer*, 566 S.W.3d at 287. But they may instead choose to seek money damages. *Id.* (citing *Koch Indus., Inc. v. Sun Co.*, 918 F.2d 1203, 1214 (5th Cir. 1990)). The Surface Owners contend that SM Energy's conduct and breach of the right of first refusal defines the "offer" that should have been made to them, and because the pertinent contractual language refers to "said well,"[9] meaning specifically the Hydra and Delphin SWD wells that were drilled in breach of the right, they are entitled to have those SWD wells placed on their lands. Because this is an impossibility, the Surface Owners sought money damages in the form of the lost benefit of their bargain.

The proper measure of damages is a question of law that we review de novo. *Signature Indus. Servs., LLC v. Int'l Paper Co.*, 638 S.W.3d 179, 187 (Tex. 2022). If the legal theories underlying the damages awarded do not conform to the law that governs the proper measure of damages, we may reverse the award as a matter of law. *Id.* We may also reverse the award if the evidence of damages is legally insufficient. *Id.* "In evaluating legal sufficiency, we are required to determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* (quoting *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994)).

Breach-of-contract damages may be direct, consequential, or both. *Signature Indus. Servs.*, 638 S.W.3d at 186 (citing *Dallas/Fort Worth Int'l Airport Bd. v. Vizant*

---

[9] "[S]hould Operator choose to drill *a Saltwater Disposal Well* within 5 miles of the Surface Lands, Operator shall give Surface Owner first right of refusal to have *said Salt Water Disposal* [*Well*] placed." (emphasis added).

*Techs., LLC*, 576 S.W.3d 362, 373 (Tex. 2019)). Direct damages may include restoring the bargain denied to the injured party, while consequential damages compensate foreseeable losses caused by the breach, but not necessarily its consequence. *Id.* Thus, the appropriate measure of damages for a breach-of-contract claim is the benefit of the bargain denied to the injured party; its purpose is to restore the injured party to the economic position he would have enjoyed had the contract been performed. *Mays v. Pierce*, 203 S.W.3d 564, 577 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). In this regard, if the jury's damage award is within the range of evidence presented at trial, a judgment incorporating the jury's award should be affirmed. *Id.* at 578.

A. *Skim Oil Revenue*

The jury awarded the Surface Owners $1,449,179 in "[s]kim oil revenue." "Skim oil" is oil that is recovered from produced saltwater before the produced water is injected into an SWD well. SM Energy contends that there is no evidence to support this award. SM Energy argues that because any saltwater that would have been injected into an SWD well on the Surface Lands would not have been produced from the Surface Lands or any subsurface formations in which the Surface Owners had an interest, the Surface Owners had no property rights in the skim oil produced from the land of others and thus would not be entitled to any royalties from it. As such, according to SM Energy, any skim oil revenue fee could only be determined and set by the parties to the agreement after meaningful negotiations, and the Surface Owners' expert presented a highly speculative model for calculating such a hypothetical fee.

SM Energy based its decision to drill the Hydra and the Delphin SWD wells, in part, on an internal economic analysis that it completed to evaluate its water-management options in Howard County; the Surface Owners relied on this analysis, in part, to support their evidence of damages. This analysis compared the costs for

33

SM Energy to "self-develop" its water-management approach with the projected costs to use third parties, including landowners, to accomplish this. In its model of costs to use third parties and landowners for this purpose, the analysis included assumed royalty costs for disposal fees of ten cents per barrel. The Surface Owners contend that those assumptions constitute ample evidence of the "benefit of the bargain" for their surface-use agreement with SM Energy.

SM Energy's internal calculations also included an assumed five-cent-per-barrel credit to itself as the owner of the land where the SWD wells would be drilled, and calculations of cumulative savings from this "self-development" option. SM Energy contends that (1) there is no evidence that any skim oil is produced from the Hydra or Delphin SWD wells, and (2) any saltwater that would have been injected into an SWD well on the Surface Lands would not have been produced from the Surface Lands or any land in which the Surface Owners had an interest, therefore the Surface Owners would have no property right in any skim oil that was produced from land owned by others. Thus, SM Energy argues, to recover skim oil damages, and because the parties' agreement does not mention or refer to skim oil in any way, the Surface Owners must have negotiated with SM Energy to have recovered any portion of skim oil revenues that it generated from its sales.

This argument is unpersuasive. SM Energy does not challenge the disposal fee award, and disposal fees also are not mentioned or referred to in the parties' agreement. Moreover, SM Energy's internal analysis includes an assumed value for skim oil, and this analysis was the basis for SM Energy's decision to "self-develop," a decision which constituted a breach of the agreement with the Surface Owners. Therefore, we conclude that the Surface Owners were entitled to use SM Energy's calculations to establish the value of the benefit of the bargain that SM Energy breached, including its assumptions for skim oil revenue. *Signature Indus. Servs.,*

638 S.W.3d at 186 (citing *Vizant Techs.*, 576 S.W.3d at 373); *Mays*, 203 S.W.3d at 577.

In addition to relying on SM Energy's calculations, the Surface Owners presented (1) the testimony of Dustin Gaskins that, based on his professional experience and personal knowledge, five cents per barrel was consistent with the typical "rule of thumb" for calculating the value of skim oil, and (2) expert testimony that developed and calculated their damages model by using the actual water volumes that were injected and disposed into the Hydra and Delphin SWD wells to ascertain the lost skim oil revenue based on SM Energy's assumed figure of five cents per barrel. Consistent with the standard that we must employ, we conclude that there is legally sufficient evidence to support the jury's skim oil revenue finding.

B. *The Value of the Wells*

However, we agree with SM Energy that, in this case, the "value of the wells" element of the jury's damages award is improper.

In support of their "value of the wells" argument, the Surface Owners offered SM Energy's "authorizations for expenditure" (AFE), which showed the cost to drill the Hydra and Delphin SWD wells; the Surface Owners contend that this value may be awarded as a damages element that is separate and distinguishable from the disposal-fee element. In their brief, the Surface Owners refer to these wells as "valuable, income-producing improvements [that] would have been constructed on their property" had SM Energy performed its obligations.

The Surface Owners' evidence concerning the "value of the wells" was not materially distinct from their evidence for the disposal fee damages that they also claimed. Although the Gaskinses testified, generally, that the presence of the wells on their land would increase the land's value, they did not offer any specific testimony or other competent evidence regarding the value of their land or how its value would increase if the SWD wells were located there. SM Energy's internal

35

analysis and communications acknowledged that purchasing land would change the calculus of SWD royalties and other costs and add valuable assets to the company's portfolio; however, there is no evidence regarding the value of the Surface Owners' land or even a general assumption as to what the value of their land would be if SWD wells were drilled and placed there.

As SM Energy contends, when it is asserted that a contract to drill an oil and gas well is breached, the Texas Supreme Court has rejected the cost of drilling the well as the proper measure of damages. *See Riddle v. Lanier*, 145 S.W.2d 1094, 1096 (Tex. [Comm'n Op.] 1941). Here, the parties' agreement does not specifically contemplate the value of performance for the right of first refusal (a point which also has been central to the parties' dispute regarding the obligations the right imposed). *See Trentman v. Whiteside*, 163 S.W.2d 418, 419 (Tex. App.—Austin 1942), *aff'd*, 170 S.W.2d 195 (Tex. 1943) ("Profits which could have been realized from such performance, where capable of proof, are recoverable as damages, especially where . . . they were in contemplation of the parties at the time they entered into the contract."); *see also Riddle*, 145 S.W.2d at 1096 ("[Plaintiff's] pleadings clearly define the measure of his damages and refute his logic concerning [the] cost of drilling the test well. The benefits which he alleges he would have received (that is, value of performance) if the well had been drilled have been explicitly defined."). Instead, we typically measure damages for the breach of such an agreement by the value of the royalty rather than the cost to drill a well. *See Sanchez–O'Brien Oil & Gas Corp. v. Austin Res. Corp.*, No. 14-96-00240-CV, 1998 WL 322686, at *9 (Tex. App.—Houston [14th Dist.] June 18, 1998, pet. denied) (citing *Guardian Tr. Co. v. Brothers*, 59 S.W.2d 343, 345 (Tex. App.—Eastland 1933, writ ref'd)).

The evidence presented by the Surface Owners regarding the value of the wells was sparse: the Gaskinses testified, generally, that the addition of SWD wells on their land would increase the land's value by its presence, in addition to the

disposal fees that the wells could generate. But, except for the cost of drilling an SWD well, the Surface Owners did not present any expert, appraisal, or other specific testimony or competent evidence, to establish or substantiate the value of their land or the potential increase in its value if such wells had been drilled and located there.[10]

In the absence of competent evidence of the value of the Surface Owners land and any indication in the parties' agreement that they contemplated an increase in the land's value, rather than or in addition to the value of the revenue to be generated by the operation of the wells as the benefit of the bargain or the value of performance in this instance, we rely on the contemplated revenue as the proper measure of damages. *See Guardian Tr. Co.*, 59 S.W.2d at 345 ("No other value to appellants than the value of the royalty was contemplated. . . . The only way to put appellants in the position they would have been put by performance would be to award them damages measured by the value of their royalty."); *see also Riddle*, 145 S.W.2d at 1096 (holding that the cost of drilling a well is not the measure of the value of performance "except perhaps in cases where the cost has been paid in advance for the drilling of a well, which, when and if completed, will belong entirely to the owner of the land or leases, and in which the driller will have no interest").

Moreover, in their operative pleading, the Surface Owners sought damages based on *disposal fees* and "[*a*]*lternatively*, . . . the benefit and *value* that SM Energy obtained from drilling the two saltwater disposal wells on its property and not [the] Surface Owners' [property]." (emphasis added). This general reference to the *value* that SM Energy obtained by drilling SWD wells on their land rather than on the

---

[10]Generally, expert testimony is required to establish market value. *See Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 851–52 (Tex. 2011). However, such valuation must be substantiated with appropriate and competent evidence. *See Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 159 (Tex. 2012); *see also Land v. Palo Pinto Appraisal Dist.*, 321 S.W.3d 722, 726 (Tex. App.—Eastland 2010, no pet.).

Surface Lands, if it can be read as defining the measure of the Surface Owners' damages, was pleaded *in the alternative* to the disposal fee damages that they sought and ultimately obtained. *See Riddle*, 145 S.W.2d at 1096 (examining the plaintiff's pleadings to define the measure of his damages). We conclude that (1) the Surface Owners are not entitled to recover both disposal fees and the value of the SWD wells as damages, and (2) the evidence is legally and factually insufficient to support the jury's finding and award for the value of the SWD wells; therefore, we vacate that finding and award.

Accordingly, we sustain SM Energy's second issue in part, and we overrule it in part.

## V. *Attorneys' Fees*

In its third issue, SM Energy requests that, if the trial court's judgment is reduced, the attorneys' fee award in favor of the Surface Owners must be vacated, and the issue must be remanded to the trial court for reconsideration. The Surface Owners contend only that the attorneys' fee award should be affirmed because the trial court correctly signed a judgment in their favor based on the jury's verdict on their breach-of-contract claim. We agree with SM Energy. Because we have reduced the damages awarded to the Surface Owners by $4,982,043.68—the value of the SWD wells element—the attorneys' fee award should be remanded to the trial court for reconsideration of the "results obtained." *See Young v. Qualls*, 223 S.W.3d 312, 314 (Tex. 2007) (quoting *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997)).

Accordingly, we sustain SM Energy's third issue.

## VI. *This Court's Ruling*

We reverse the trial court's judgment insofar as it awards damages to the Surface Owners in the amount of $4,982,043.68 for the value of the SWD wells, and we vacate that award and render judgment that the Surface Owners take-nothing on

that claim.  Further, we reverse the trial court's judgment regarding the attorneys' fees and prejudgment interest awarded to the Surface Owners, and we remand those issues to it for reconsideration and further proceedings consistent with this opinion. In all other respects, we affirm the judgment of the trial court.


W. STACY TROTTER

JUSTICE


December 1, 2025

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.